# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY SHOWERS-BAKER,<br><br>                  Plaintiff,<br><br>    v.<br><br>JO ANNE B. BARNHART, Commissioner<br>of Social Security,<br><br><br>                 Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:04cv6022 DLB<br><br>ORDER REGARDING PLAINTIFF'S<br>SOCIAL SECURITY COMPLAINT |

## **BACKGROUND**

Plaintiff Cindy Showers-Baker ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On April 14, 2005, the Honorable Anthony W. Ishii reassigned the case to the undersigned for all purposes.

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed an application for disability insurance benefits on December 3, 1999.  AR 92-94, 101-110.  She alleged that she had been disabled since May 20, 1998, due to myofascial pain, edema, costochondritis, fibromyalgia, depression, anxiety, and pain in her hand, wrist, neck and shoulder.  AR 102.  After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  68-71, 72, 78.  On November 8, 2001, ALJ Bert C. Hoffman held a hearing.  AR 942-984.  On January 31, 2002, ALJ Hoffman found that Plaintiff was not disabled.  AR 58-67.  On July 8, 2002, the Appeals Council remanded the case for further proceedings.  AR 88-90.

On December 5, 2002, ALJ Hoffman held a second hearing.  AR 985-1026.  On February 19, 2003, ALJ Hoffman again found that Plaintiff was not disabled.  AR 15-27.  On June 3, 2004, the Appeals Council denied review.  AR 7-10.

Hearing Testimony

*First Hearing*

On November 8, 2001, ALJ Hoffman held a hearing in Fresno, California.  AR 942. Plaintiff appeared along with her attorney, Gary Hills.  AR 942.

Plaintiff testified that she was 36 years old at the time of the hearing.  AR 946.  She completed the ninth grade.  AR 946.  She has a drivers' license and drove to the hearing, but it caused pain in her hands, fingers, wrist, arms, neck and shoulders.  AR 947.  She also explained that riding as a passenger hurts because she can't sit for too long.  AR 948-949.

Plaintiff last worked in May 1998 in the service deli at a grocery store.  AR 949.  She has always been in the service deli industry.  AR 949.  She stopped working because both of her wrists and left shoulder hurt to the point where she could no longer move them.  AR 956.  The doctors determined that it was a work-related injury.  AR 958.  She went through several types of physical therapy and pain medications and a doctor told her that surgery would not help.  AR 958.  She also endured pain injections that did not help.  AR 959.  She received a $63,000.00

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

workers' compensation settlement.  AR 960.  She eventually underwent carpal tunnel surgery on both hands but has had no relief.  AR 960-961.

During the hearing, she said that she "hurt very bad," and that she had pain in her neck, shoulders and in the front of her chest.  AR 962.  She has migraines associated with the neck pain.  AR 963.  She experiences them a couple of times per week, and when she gets one, she is "down" for the whole day.  AR 964.  She testified that she has a hypersensitivity in her arm from fibromyalgia.  AR 966.  She had been seeing a doctor for her depression, but stopped a few months ago because the visits cost $120.00 each and her insurance does not cover the cost.  AR 967.

Plaintiff testified that she could bend at the waist, but that it pulls in her neck and upper back.  AR 968.  To lift a gallon of milk, she has to guide it with her hip and arm.  AR 969.  She does laundry, but her son or daughter pull the clothes out of the washer and put them into the dryer.  AR 969.  She can unload the dishes from the dishwasher onto the counter, but then her husband has to put them away.  AR 969.  She can vacuum with a self-propelled vacuum.  AR 969.  She said she could pick up a pan.  AR 969.  She cooks with help.  AR 970.

Plaintiff testified that she cannot shower, do her hair and put on makeup all in one day.  AR 970.  She takes her daughter horseback riding, but she can only ride the horse while it walks.  AR 971.  She goes to Pismo Beach often with her husband.  AR 971.  She also watches her granddaughter play soccer.  AR 973.  She goes to the mall and Target with her friend.  AR 975.

She explained that her doctors had recommended that she exercise, but she doesn't because it pulls her muscles and she can't do anything after.  AR 976.  She would like to return to gainful activity but her doctors tell her that there's nothing more they can do.  AR 977.  She attended vocational rehabilitation during her workers' compensation case, but was told that there was nothing she could be retrained to do because of her headaches, pain, anxiety and sitting limitations.  AR 978.

When questioned by her attorney, she explained that she could straighten up around the house, but that her daughter and husband make the beds.  AR 979.  She does things around the house in "sections," and rests in between each task.  AR 979.  Because of her pain, or her

inability to do much, she smokes quite a bit. AR 979. She lays down eight or nine times per day and uses a heating pad often. AR 979. The cold weather makes her muscles hurt more. AR 980. She cannot use a keyboard. AR 980-981.

Since her surgeries, her wrists don't tremble as much but they hurt more. AR 981. She also has less grip strength. AR 981.

*Second Hearing*

On December 5, 2002, ALJ Hoffman held a second hearing in Fresno, California. AR 985. Plaintiff appeared along with her attorney, Gary Hill. Deborah Hanson testified as a witness. Vocational expert ("VE") Jose Chaparo also appeared and testified. AR 985.

At the time of the hearing, Plaintiff testified that she was 122 pounds, and explained that she has just been losing weight because she has no appetite. AR 989. She explained that she could not work because of severe pain in her arms and most of her body. AR 994. She has been diagnosed with fibromyalgia and myofascial syndrome. AR 996. She also has pain in her back, knees and ankles. AR 994-997. She recently had a series of injections that helped lessen her back pain. AR 997.

Since the last hearing, Plaintiff returned to a vocational rehabilitation expert, and was sent for a functional capacity evaluation. AR 999. It was supposed to be a four hour test, but she only lasted about 75 minutes because of the pain. AR 999. Other than the increase in pain in her back, knees and ankles, Plaintiff's symptoms have remained the same since her last hearing. AR 999.

Plaintiff testified that she lives in a house with her husband and her 11 year old daughter. AR 1000. Her mother, sister and her sister's two boys are also living with her. AR 1000. They moved in with her from North Carolina, about seven months ago, to help her. AR 1000.

She can carry only very light items. AR 1002. When she goes grocery shopping, she needs help. AR 1003. Her ankles hurt if she walks too much. AR 1005. She has an exercise ball at home from physical therapy, but every time she uses it, she's in severe pain for three or four days. AR 1005. Her husband does the bookkeeping for the household because she is unable

to sit down and write checks.  AR 1005.  Her sister and mother do all of the cooking since they have been living with her.  AR 1006.

During a normal day, she paces a lot.  AR 1007.  She also has to lay down quite a bit because of her back.  AR 1007.  She straightens up around the house and can wipe little spots on the counter.  AR 1007.  Her mom has been doing the laundry since she's been living with her. AR 1008.

She no longer sees a mental health practitioner because her insurance doesn't cover the visits.  AR 1010.  She explained that it was hard for her to get to her appointments because she doesn't like to leave her house.  AR 1010.  She has received shots in her arms and neck since the last hearing.  AR 1010.

She thought she could stand for 10 minutes at a time and walk for 15-20.  AR 1012.  She could lift, but not carry, about four pounds.  AR 1012.

Deborah Hanson, Plaintiff's sister, testified that she lives with Plaintiff and moved in solely for the purpose of taking care of her.  AR 1015.  She was planning on moving into her own place nearby.  AR 1016.

Ms. Hanson testified that she has seen Plaintiff wipe the kitchen counter and put dog food in the dog bowl.  AR 1016.  She can't clean because she's in too much pain.  AR 1016.  She has only seen her sister walk around the cul-de-sac because of pain.  AR 1017.  While shopping, she can't lift anything heavy and can't reach.  AR 1017.  Ms. Hanson does most of the driving because it is too painful for her sister.  AR 1019.

VE Chaparo testified that a person with an unskilled work background and limited educational background, who could stand for no more than 10 minutes, walk or be on their feet for no more than 15-20 minutes, and lift no more than four pounds and carry less, could not perform any job.  AR 1020.

This same person, but with the RFC to lift and carry more than 10 pounds frequently and 20 pounds occasionally, but couldn't perform repetitive use and forceful pushing/pulling activities with the upper extremities (i.e., could do it occasionally and without great force), could perform work in the national economy.  AR 1020.  Specifically, this person could be a

surveillance systems monitor (500 positions in California, 5,500 nationally), photo finishing clerk (1,400 in California, 12,400 nationally) and bottling line attendant (800 in California, 6,700 nationally).  AR 1021-1022.

When questioned by Plaintiff's attorney, the VE explained that the surveillance job is flexible because it allows the person to sit or stand at will.  AR 1023.  However, the position requires some fine manual dexterity because there is occasional writing and camera adjusting.  AR 1024.  The photo finishing clerk position also requires some fine manual dexterity because it requires the ability to pick up a photo.  AR 1024.  The bottle line attendant requires the ability to hold hands out in front of the body.  AR 1024.

Medical Record

On May 20, 1998, Plaintiff saw D. Kevin Lester, M.D.  He diagnosed severe bilateral carpal tunnel syndrome and recommended surgery.  AR 328.

On August 24, 1998, Plaintiff saw John L. Branscum, M.D., for evaluation of her complaints.  AR 244.  He determined that Plaintiff suffered from bilateral overuse syndrome of the upper extremities and that this was work-related.  AR 246.  He opined that Plaintiff was temporarily totally disabled and recommended that she start physical therapy.  AR 246.

From September 1998 through December 1998, Plaintiff treated with David E. Taylor, M.D.  AR 392-398.  He diagnosed Plaintiff with chronic pain syndrome involving both upper extremities, and felt that no orthopedic medical or surgical benefits could be afforded her.  AR 392.  He recommended psychological counseling and pain management.  AR 392.

On September 25, 1998, Plaintiff was referred to Mauro K. Leyba, Jr., M.D. for evaluation of possible rheumatic disease.  AR 330.  Upon examination, he did not see any inflammatory arthropathy related conditions causing her problems.  AR 331.  Plaintiff's problems appeared mechanical in nature, although she had some neuropathic features on her hands consistent with carpal tunnel syndrome.  AR 331.

Plaintiff saw neurologist Frank L. Cantrell, M.D., on November 5, 1998, for her multiple complaints.  AR 249.  Upon examination, Plaintiff had marked tenderness in numerous areas.  AR 251.  He diagnosed bilateral extensor forearm myofascial pain with resultant disuse and

edema, bilateral hand and wrist pain, probably due to stasis edema, left anterior shoulder pain due to biceps and bicipital tendinitis with mildly frozen shoulder, left costochondritis due to pectoralis strain, neck pain, musculoskeletal in origin, and right wrist ganglion.  AR 252.  He opined that Plaintiff needed alternate medications and an alternate form of therapy, as her "passive approach to her problem to date has been little short of disastrous."  AR 252.  He opined that surgery was contraindicated and that a course of reasonable physical therapy, with a stretching and exercise program, was appropriate.  AR 252.

On January 21, 1999, Plaintiff underwent a psychiatric evaluation by Francisco E. Montalvo, M.D.  AR 349.  He diagnosed her with severe major depression and recommended pharmocotherapy and psychotherapy.  AR 353.  He also noted that Plaintiff suffered from anxiety.  AR 353.  In February 1999, Dr. Montalvo diagnosed Plaintiff with agoraphobia and panic attacks.  AR 885.  In May 1999, he noted obsessive compulsive behavior.  AR 883.

Between February and June 1999, Plaintiff saw Robert Salazar, M.D., for pain management.  AR 380-391.  As of June 15, 1999, her condition was "minimally improved."  AR 380.

On May 27, 1999, Plaintiff underwent an evaluation by Thomas J. O'Laughlin, M.D., a physiatrist.  AR 368.  After an examination, Dr. O'Laughlin opined that Plaintiff had a very severe bilateral upper extremity myofascial pain disorder/muscular overuse syndrome, but did not have the whole fibromyalgia complex.  AR 372.  He recommended aggressive physical therapy and multiple trigger point and tendon injections.  AR 372.  He noted that this was one of the "worst" cases he has seen.  AR 372.  Plaintiff continued to see Dr. O'Laughlin regularly through December 1999.  AR 357-367.

At the direction of Dr. O'Laughlin, Plaintiff underwent physical therapy in June 1999.  AR 226-234.  After a few sessions, Plaintiff indicated that she could not tolerate the therapy and was discharged.  AR 226.

In a report dated August 20, 1999, Dr. Montalvo diagnosed Plaintiff with major depression and agoraphobia with panic attacks.  AR 333.  He described her prognosis as fair.  AR 334.  ____

Plaintiff saw G.J. Kucera, M.D., for an Agreed Medical Evaluation on October 26, 1999. AR 310.  Upon examination, Plaintiff was tender to the touch all over her upper body.  AR 317. He diagnosed overuse syndrome of the upper extremities, tendinitis, mild carpal tunnel syndrome, lateral epicondylitis, shoulder bursitis/impingement, cervical spine sprain/strain, regional pain syndrome, and possible fibromyalgia.  AR 322.  He noted that Plaintiff's subjective complaints were significantly higher than the objective findings, but that this is typical in light of her diagnosis.  AR 323.  He suggested pain management and counseling.  AR 322-323.  He precluded Plaintiff from very heavy lifting, repetitive twisting of the head and neck, repetitive use of the arms above shoulder level, and forceful activities bilaterally.  AR 321.

Plaintiff also underwent physical therapy in December 1999.  AR 219-225.  After two sessions, Plaintiff indicated that she was in so much pain she could not use her arms, and blamed the pain on the exercises.  AR 219.

On January 26, 2000, Plaintiff underwent a psychiatric examination by Agreed Medical Examiner Robert T. Grattan, M.D.  AR 258.  After examination and testing, Dr. Grattan diagnosed Plaintiff with pain disorder associated with both psychological factors and a general medical disorder, panic disorder, under control with medication, and low grade dysthymia.  AR 279.  He opined that the degree of residual psychiatric disability ranged between very slight to slight.  AR 280.

On February 10, 2000, Dr. O'Laughlin indicated that Plaintiff was permanent and stable with regard to what can be done for her.  AR 217.  He opined that she had lost fifty percent of her capacity for strength and endurance tasks in both upper extremities and has continuous mild to moderate aching pain in the upper extremities, neck and shoulders.  AR 217.  She also had slightly limited range of motion in the cervical spine.  AR 217.  Based on this assessment, he imposed permanent work restrictions, including no repetitive grasping, no keyboarding for more than 10-15 minutes without a five minute break and for no more than two hours per day, no continuous or repetitive overhead work, and no lifting greater than 10 pounds total.  AR 217.

On March 23, 2000, Plaintiff saw William Chow, M.D. for an orthopedic consultation. AR 179.  She had normal range of motion in her back, but limited range of motion in her

shoulders, elbows and wrists. AR 181. There was no evidence of joint pain, swelling or tenderness, but there was palpable tenderness in the bilateral triceps, biceps and forearm muscle. AR 181. Grip strength was 5/5 bilaterally. AR 182. Dr. Chow opined that her limited range of motion was due to myofascial pain, not joint deformity. AR 183. The weakness in her bilateral upper extremities is also due to pain. AR 183. There were temperature discrepancies in her right upper extremity most likely related to myofascial pain syndrome. AR 183. He opined that she could carry less than 10 pounds occasionally during a third of an eight hour workday, could stand, walk and sit without limitation, but would be limited in bilateral reaching, feeling, fingering and fine manipulation. AR 183.

On April 6, 2000, Carmen E. Lopez, M.D. completed a Physical Residual Functional Capacity Assessment form. AR 184. He opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk about six hours in an eight hour workday, could sit about six hours in an eight hour workday, but had to avoid repetitive pushing and pulling with the upper extremities. AR 185. She was limited in reaching in all directions and handling (gross manipulation). AR 187. Specifically, Plaintiff had to avoid repeated overhead reaching bilaterally with the upper extremities and had to avoid forceful twisting, squeezing and grasping with bilateral hands. AR 187. Dr. Lopez noted that Dr. Chow's limitations were too restrictive and not supported by objective findings. AR 191. These findings were affirmed on September 13, 2000. AR 191.

On April 14, 2000, Plaintiff saw Dr. O'Laughlin and complained of light sensitivity and pain around her eyes. AR 214. On examination, there was marked tightness and tenderness at both occipital regions. AR 214. He diagnosed an exacerbation of suboccipital muscle tightening that has contributed to tension headaches and overlapping symptoms of migraine headache. AR 214. Plaintiff received trigger point injections and felt markedly better. AR 214.

On May 17, 2000, Plaintiff saw Shireen R. Damania, M.D. for a psychiatric evaluation. AR 192. Plaintiff complained of constant and consistent pain and indicated that her medications cause her to be drowsy during the day. AR 194. Dr. Damania diagnosed Plaintiff with depressive disorder, not otherwise specified, and pain disorder, associated with both

psychological factors and a general medical condition.  AR 195.  Dr. Damania believed that Plaintiff's interpersonal skills and social functioning were adequate.  AR 196.  Plaintiff had no difficulties in concentration, persistence and pace, and was able to understand, remember and carry out simple and complex instructions.  AR 196.  She could respond appropriately to co-workers and supervisors, but would have difficulty responding appropriately to usual work situations or changes in routine work setting, attendance and safety because of her chronic pain and fatigue.  AR 196.

On June 1, 2000, a State Agency physician completed a Psychiatric Review Technique form, and opined that Plaintiff had depression, not otherwise specified.  AR 200.  In a Mental Residual Functional Capacity Assessment form, the physician opined that Plaintiff was moderately limited in her ability to interact with the general public and co-workers.  AR 207. These findings were affirmed on September 6, 2000.  AR 208.

On June 28, 2000, Dr. O'Laughlin gave Plaintiff six trigger point injections.  AR 212.  He assessed Plaintiff with severe chronic pain syndrome with widespread aching pain, insomnia and fatigue typical of fibromyalgia and muscular overuse syndrome/myofascial pain syndrome involving the forearms, arms and shoulder girdles.  AR 213.

On July 26, 2000, Dr. O'Laughlin noted moderate hardening of the right trapezius and tenderness over the fibromyalgia tender points.  AR 210.  Plaintiff had two trigger point injections.  AR 210.

On July 28, 2000, Gareth C. Houghton, Ph.D., conducted a psychological evaluation.  AR 304.  He diagnosed pain disorder affected by both psychological features and a general medical condition and major depressive disorder, reactive to pain.  AR 306.

On August 1, 2000, Plaintiff participated in a vocational evaluation.  AR 235.  The examiner determined Plaintiff's pain, anxiety and depression precluded her from focusing on vocational rehabilitation.  AR 238.  He noted that Plaintiff's daughter appeared to be her caretaker and that he found Plaintiff credible.  AR 238.

On August 4, 2000, Dr. Grattan prepared a supplemental report after viewing two videotapes of Plaintiff.  AR 254.  The videotapes, taken in March 1999 and March 2000, show

Plaintiff briskly walking a young girl to the bus stop and back, conversing with the people at the bus stop and appearing animated with smiles and gestures, standing with one foot on the bumper of a car, pumping gas, entering a store and exiting carrying an article, and exiting a store pushing a cart. AR 255. Dr. Grattan noted that although Plaintiff complained of being fearful and apprehensive in crowds, she did not appear fearful or apprehensive on the tapes. AR 255. He concluded, though, that the tapes did not change his opinions expressed in his January 26, 2000, report. AR 256.

Dr. O'Laughlin referred Plaintiff to Dr. Houghton for biofeedback training. AR 906-908. Group therapy pain management was initiated on November 3, 2000. AR 905. Plaintiff attended two sessions, but missed the next two. AR 905.

On February 9, 2001, Dr. Houghton informed Plaintiff that he could no longer provide services to her because she was unable to keep appointments or return phone calls. AR 903.

On March 21, 2001, Plaintiff saw Dr. O'Laughlin and complained of a severe headache. AR 355. Dr. O'Laughlin opined that the headache may be caused by chronic Vicodin usage, and convinced Plaintiff to come off the Vicodin. AR 356. Her pain would be treated with Ibuprofen and Tylenol. AR 356.

In August 2001, Dr. Lester diagnosed Plaintiff with bilateral carpal tunnel syndrome, electrically proven, and recommended bilateral carpal tunnel release. AR 325.

Plaintiff underwent bilateral carpal tunnel release on August 10, 2001. AR 326.

On March 14, 2002, Plaintiff underwent a one day functional capacity evaluation. AR 887. Plaintiff requested that the session be terminated after less than two hours because of an increase in her subjective pain complaints. AR 890. Tom Dachelet, a vocational rehabilitation counselor, reviewed this evaluation and concluded that Plaintiff could not perform even part-time work. AR 892.

ALJ's Findings

The ALJ determined that Plaintiff's complaints were not as severe as alleged. AR 26. He determined that she had the RFC to perform the physical exertion and nonexertional requirements of work, except for lifting and carrying more than 10 pounds frequently and 20

11

pounds occasionally, and would be precluded from repetitive use of the arms above shoulder

level and from forceful push and pull activities with the upper extremities.  AR 26.  Based on this

RFC and the testimony of the VE, the ALJ found that she could perform a significant number of

jobs in the national economy, such as surveillance systems monitor, photo-finishing counter

clerk, and bottling line attendant.  AR 26-27.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision

to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

the Court must determine whether the decision of the Commissioner is supported by substantial

evidence.  42 U.S.C. 405(g).  Substantial evidence means "more than a mere scintilla,"

*Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

*Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

401.  The record as a whole must be considered, weighing both the evidence that supports and

the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

This Court must uphold the Commissioner's determination that the claimant is not disabled if the

Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in

substantial gainful activity due to a medically determinable physical or mental impairment which

has lasted or can be expected to last for a continuous period of not less than 12 months.  42

U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

such severity that he is not only unable to do her previous work, but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated

regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3]  Applying this process in this case, the ALJ

found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

disability; (2) has an impairment or a combination of impairments that is considered "severe"

(overuse syndrome with resulting cervical spine, bilateral shoulder, elbow, wrist and hand pain;

status post bilateral carpal tunnel release; and a pain disorder) based on the requirements in the

Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of

impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P,

Regulations No. 4; (4) cannot perform her past relevant work; (5) but retains the RFC to perform

a significant number of jobs in the national economy.  AR 25-26.

Plaintiff argues that (1) the ALJ failed to give clear and convincing reasons for rejecting

her testimony; (2) the ALJ improperly relied on the videotape summary by Dr. Grattan; (3) the

ALJ improperly ignored medical evidence; (4) the ALJ erred in rejecting the opinions of the

treating and examining physicians; (5) the ALJ improperly ignored lay witness testimony; and (6)

the vocational findings were not supported by substantial evidence.

## DISCUSSION

A.    Plaintiff's Testimony

Plaintiff argues the ALJ erred in rejecting her testimony for numerous reasons.

Specifically, she contends that the ALJ erred by citing the gaps in treatment and her failure to

follow prescribed treatment.  She also alleges that the ALJ misstated her testimony.

The ALJ is required to make specific findings assessing the credibility of plaintiff's

subjective complaints.  *Cequerra v. Secretary of HHS,* 933 F.2d 735 (9th Cir. 1991).  In rejecting

---

[3] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

the claimant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996)(quoting *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988)).

"Despite the inability to measure and describe it, pain can have real and severe debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from working." *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). It is possible to suffer disabling pain even where the degree of pain is unsupported by objective medical findings. *Id.* "In order to disbelieve a claim of excess pain, an ALJ must make specific findings justifying that decision." *Id.* (citing *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989). The findings must convincingly justify the ALJ's rejection of the plaintiff's excess pain testimony. *Id.* at 602. However, an ALJ cannot be required to believe every allegation of disabling pain. "This holds true even where the claimant introduces medical evidence showing that he has an ailment reasonably expected to produce some pain." *Id.* at 603.

Once a claimant produces medical evidence of an underlying impairment likely to cause the alleged pain, the ALJ may not discredit the allegations of the severity of the pain solely because the evidence does not support plaintiff's statements. *Lester*, 81 F.3d at 834 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991)(*en banc*)).

In finding Plaintiff not fully credible, the ALJ cited numerous reasons. He noted the discrepancies between Plaintiff's complaints and her actions on the videotapes. AR 24. He noted that she testified that her symptoms had remained about the same since the last hearing, when she testified that she went to Target and the mall, drove, did laundry, vacuumed, picked-up clothes, loaded the dishwasher, straightened the house, visited friends, watched her granddaughter play soccer, took care of a friend's children while the friend moved, and traveled to Pismo Beach twice a month for weekend getaways. AR 24.

14

1    The ALJ also noted "episodic visits or large gaps of time between visits to the doctor

2    seeking relief of the severe pain since October 21, 1998." AR 24.  The ALJ also explained that

3    some follow-up appointments were conducted by a family nurse practitioner, and that since

4    October 21, 1998, Plaintiff had only seen Dr. Graham, whom she testified was her sole treating

5    physician, nine times and received minimal, conservative treatment for her alleged pain.  AR 24.

6    Moreover, Plaintiff failed to attend doctors appointments.  AR 24-25.  Finally, the ALJ noted that

7    Plaintiff failed to seek medical treatment at one point for a 13-month period.  AR 25.  The ALJ

8    concluded that these factors suggest that Plaintiff's symptoms were not as severe as alleged.  AR

9    25.

10       The ALJ certainly set forth specific findings explaining why Plaintiff's complaints were

11   not as severe as alleged.  *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir.1991).  However, his

12   reasons were not proper.  While the ALJ is entitled to draw inferences from a failure to seek

13   medical care, the record here does not support such an inference.  *Fair v. Bowen*, 885 F.2d 597,

14   603 (9th Cir.1989) (finding it appropriate to consider "an unexplained, or inadequately explained,

15   failure to seek treatment").  Although Plaintiff's treatment with Dr. Graham may have been

16   sporadic, Plaintiff saw numerous doctors on an almost continuous basis from 1998 through the

17   time of the second hearing.

18       Plaintiff also contends that the ALJ erred by stating that she saw Dr. Montalvo only once

19   after her workers' compensation case settled.  AR 25.  Plaintiff argues that she explained at both

20   hearings that her insurance did not cover the costs of the visits, and that this inability to pay for

21   treatment justifies the failure to obtain it.  Plaintiff is correct that an ALJ may not discredit a

22   claimant for not obtaining medical treatment where the claimant cannot afford it.  Gamble v.

23   Chater, 68 F.3d 319, 322 (9th Cir. 1995).

24       Insofar as Plaintiff faults the ALJ for citing her failure to follow prescribed treatment, her

25   argument misunderstands the ALJ's use of the information.  Plaintiff's authority deals with a

26   denial of benefits where the claimant has a *disabling impairment* and fails to follow treatment

27

28                                           15

that may restore the claimant's ability to work.  20 C.F.R. § 404.1530.  Here, the ALJ found that Plaintiff did not have a disabling impairment, and evaluated Plaintiff's noncompliance only in the context of evaluating her credibility.

Finally, Plaintiff contends that the ALJ misstated her testimony regarding her changed symptoms.  While the ALJ stated that Plaintiff testified that her symptoms remained about the same since the last hearing, Plaintiff submits that she testified that since the prior hearing, "other than knees, ankles, and back, all symptoms at the same."  AR 999.  Plaintiff contends that it was therefore improper for the ALJ to rely on Plaintiff's description of daily activities from the first hearing.

Indeed, Plaintiff testified at the second hearing that, other than the increase in symptoms from her knees, ankles and back, the nature of her problems was about the same.  AR 999. Plaintiff then described activities of daily living that were more limited than those described in the first hearing.  For example, her mother and sister had moved in with her to help her, and they do the cooking and the laundry.  AR 1000, 1006, 1008.  She can only carry very light items and needs help when grocery shopping.  AR 1002-1003.  Her husband does the bookkeeping for the household because she is unable to sit down and write checks.  AR 1005.  During a normal day, she paces a lot.  AR 1007.  She also has to lay down quite a bit because of her back.  AR 1007. She thought she could stand for 10 minutes at a time and walk for 15-20.  AR 1012.  She could lift, but not carry, about four pounds.  AR 1012.  About the only thing that Plaintiff testified that she could do was straighten up around the house and wipe little spots on the counter.  AR 1007.

Plaintiff is correct that the ALJ misstated her testimony.  Although the ALJ can properly consider her activities of daily living in evaluating her credibility, he cannot assume she can do certain tasks where she testified that she has new ailments.  As Plaintiff points out, the ALJ acknowledged during the second hearing that Plaintiff had new pain in her back, ankles and knees, yet assumed that her symptoms were the same and that she therefore could do all of the activities stated during the first hearing.  This was error.

1   The ALJ's credibility determination was not supported by substantial evidence as the ALJ

2   relied on improper bases to find Plaintiff's subjective complaints of pain not as severe as alleged.

3   In social security cases, the decision to remand to the Commissioner for further proceedings or

4   simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d

5   599, 603 (9th Cir. 1989). If additional proceedings can remedy defects in the original

6   administrative proceedings, a social security case should be remanded. Here, the Court finds that

7   additional proceedings can remedy the defects noted above. Remand instructions will be

8   discussed fully at the end of this opinion.

9   B.   Videotape Summary

10      _____Plaintiff next argues that the ALJ improperly relied on the videotape summary prepared

11   by Dr. Grattan. Citing *Richardson v. Perales*, 402 U.S. 389 (1971), she argues that the videotape

12   evidence was unreliable because Plaintiff was unable to cross-examine the person who took the

13   video or Dr. Grattan, and was unable to examine the videotapes because they were not made part

14   of the record.

15      In *Richardson v. Perales*, the Supreme Court determined that a written report by an

16   examining physician may be received as evidence in a disability hearing and, despite its hearsay

17   character and an absence of cross-examination, may constitute substantial evidence in finding the

18   claimant not disabled. 402 U.S. at 402. At the outset of the analysis, the Court recognized that

19   under the Social Security Regulations, the strict rules of evidence, applicable in the courtroom,

20   "are not to operate at social security hearings so as to bar the admission of evidence otherwise

21   pertinent." 402 U.S. at 400.

22      Here, the videotapes of Plaintiff taken in connection with her workers' compensation case

23   were pertinent to Plaintiff's claim. The video was taken during the time in question and during a

24   time when Plaintiff was complaining of quite severe pain. Furthermore, at the beginning of each

25   hearing, Plaintiff's attorney was given an opportunity to object to the introduction of evidence,

26   including Dr. Grattan's videotape summary. AR 945, 988. There were no objections and the

27

28                                              17

1  evidence was received.  AR 945, 988.  Although Plaintiff now contends that "editing" might

2  have occurred, which may have included cutting out portions that show Plaintiff's difficulties or

3  limitations and/or speeding up the timing of the tape so that Plaintiff appears to be walking at a

4  quicker pace, such allegations are merely speculative.

5  Finally, insofar as Plaintiff contends that the videotapes and Dr. Grattan's summary are

6  unreliable because she was not offered the opportunity to cross-examine, her argument fails.  The

7  inability to cross-examine does not necessarily render evidence unreliable.  *Richardson,* 402 U.S.

8  at 402.

9  C.   Medical Evidence

10  Next, Plaintiff claims that the ALJ ignored certain medical evidence in his RFC findings.

11  Specifically, Plaintiff contends that the ALJ ignored her fibromyalgia symptoms, her psychiatric

12  impairments, her history of severe migraine headaches, and the side effects of her medication.

13  RFC is an assessment of an individual's ability to do sustained work-related physical and

14  mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a

15  week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment must be based on all of

16  the relevant evidence in the record, including the effects of symptoms that are reasonably

17  attributed to a medically determinable impairment.  SSR 96-8p.  In addition, the adjudicator

18  "must consider limitations and restrictions imposed by all of an individual's impairments, even

19  those that are not 'severe,'" because such limitations may be outcome determinative when

20  considered in conjunction with limitations or restrictions resulting from other impairments.  SSR

21  96-8p.

22  1.   *Fibromyalgia*

23  Plaintiff argues that the ALJ failed to include her symptoms of fibromyalgia in his RFC

24  findings.  She contends that the ALJ did not discredit these symptoms and therefore should have

25  included them in his RFC analysis.

26

27

28

Here, Plaintiff contends that the she was diagnosed with fibromyalgia in February 2000.
She explains that she testified to severe arm, neck, fingers, shoulder, chest and diffuse upper
extremity pain.  AR 994-999.  She also notes that treating physicians Dr. O'Laughlin, Dr.
Graham and Dr. Montalvo have documented Plaintiff's complaints of pain, aching and fatigue,
and that she has received trigger point injections as part of her treatment.

In analyzing the evidence, the ALJ found that there was "no question that the claimant
does suffer from some discomfort that limits her from engaging in certain physical activities."
AR 19.  Nonetheless, he found that Plaintiff retained the RFC to perform a restricted level of
light work.  AR 19.  While this may very well be a proper RFC assessment, it is difficult to
determine because of the ALJ's faulty credibility assessment.  Many symptoms associated with
fibromyalgia are highly subjective.  Accordingly, if the credibility determination changes on
remand, the ALJ should also analyze the RFC assessment in light of the credibility finding.

2.    *Psychiatric Impairments*

Next, Plaintiff argues that the ALJ ignored Dr. Montalvo's diagnoses of agoraphobia,
anxiety and obsessive compulsiveness, the medications taken for the impairments, and his "fair
to poor" prognosis.  Plaintiff also argues that the ALJ ignored the psychiatric consultive
examiner's finding that Plaintiff would have difficulty responding appropriately to usual work
situations.

In analyzing Plaintiff's mental impairments, the ALJ reviewed Plaintiff's treatment with
Dr. Montalvo and noted that he diagnosed her with major depression and panic attacks.  AR 19.
He also noted that as of February 2000, Plaintiff was responding to the prescribed medication.
AR 19.  He noted that Dr. Montalvo's recommendation that Plaintiff receive vocational training
suggested that he felt Plaintiff could adhere to the stress and pressures of a work environment on
a sustained basis.  AR 21.  The ALJ did not accept Dr. Montalvo's finding that Plaintiff was
disabled from July 2000 to January 2001 because he did not indicate what criteria he used to

support his conclusion, and his clinic notes offer only Plaintiff's subjective complaints.  AR 21-22.

Although the medical record includes additional diagnoses not contemplated by the ALJ, there is no evidence that these diagnoses resulted in any limitations.  In any event, the ALJ's finding that Plaintiff's mental impairments did not significantly impact her ability to work was supported by substantial evidence.  The ALJ relied upon the findings of examining physicians Dr. Grattan and Dr. Damania.  AR 25.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultive examiner's opinion is substantial evidence).  Dr. Grattan opined that the degree of Plaintiff's residual psychiatric disability ranged between very slight to slight.  AR 280.  Similarly, Dr. Damania opined that Plaintiff's interpersonal skills and social functioning were adequate, that she had no difficulties in concentration, persistence and pace, that she was able to understand, remember and carry out simple and complex instructions, and that she could respond appropriately to co-workers and supervisors.  AR 196.

Contrary to Plaintiff's contention, the ALJ properly rejected Dr. Damania's opinion that she would have difficulty responding appropriately to usual work situations.  He explained that this limitation was based more on Plaintiff's subjective physical complaints and not from a psychiatric point of view, which was Dr. Damania's specialty.  AR 25.  *See* 20 C.F.R. § 404.1527(d)(5).

3.    *History of Severe Migraine Headaches*

Next, Plaintiff argues that the ALJ ignored evidence of Plaintiff's history of severe migraine headaches.  In support of her argument, she cites evidence of her headaches dating back to 1990.

Again, however, there is no evidence that her headaches resulted in any limitations.  Indeed, although Plaintiff may have had a history of severe migraine headaches, she continued working throughout that time period.  Since she stopped working, she complained of headaches only twice.  On April 14, 2000, she saw Dr. O'Laughlin and complained of light sensitivity and

20

pain around her eyes.  AR 214.  He diagnosed an exacerbation of suboccipital muscle tightening that has contributed to tension headaches and overlapping symptoms of migraine headache, and administered trigger point injections after which she felt markedly better.  AR 214.  On March 21, 2001, Plaintiff saw Dr. O'Laughlin and complained of a severe headache.  AR 355.  However, Dr. O'Laughlin attributed the headache to chronic Vicodin usage, not migraines.  AR 356.

> 4.   *Side Effects of Medication*

Finally, Plaintiff argues that the ALJ improperly ignored the reported side effects of Plaintiff's medications.  In support of her argument, she cites her May 17, 2000, evaluation by Dr. Damania during which she reported experiencing drowsiness during the day.[4]  AR 194.  She also points to her June 11, 2002, Daily Activities Questionnaire in which she reported experiencing drowsiness from her pain and anxiety medications.  AR 167.

Again, just because Plaintiff may experience drowsiness does not necessarily mean that there are any resulting limitations that affect her ability to work.  There is no evidence in the record of any limitations caused by her alleged drowsiness.

D.   Examining and Treating Physician Opinions

Plaintiff next argues that the ALJ failed to give specific and legitimate reasons for rejecting the opinions of Dr. O'Lauglin, Dr. Montalvo, Dr. Chow and Dr. Kucera.  She contends that these doctors provided "well-supported material evidence that the ALJ should have included in his RFC."

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  As a general rule, more weight should be given to the opinion of a treating source

---

[4] Plaintiff also states that she reported tremors as a side effect to Dr. Damania.  However, a review of Dr. Damania's report indicates that Plaintiff complained of tremors as an independent symptom, for which Xanax helped.  AR 194.

than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987).  The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990).  The contradicted opinion of either a treating source or an examining source may be rejected only for specific and legitimate reasons that are supported by substantial evidence in the record.  . *Murray v. Heckler,* 722 F.2d 499, 502 (9th Cir.1983)*; Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

      1.    *Dr. O'Laughlin*

Plaintiff contends that although the ALJ included Dr. O'Laughlin's preclusion from heavy levels of exertion and repetitive activities with the upper extremities, he ignored Dr. O'Laughlin's preclusions from repetitive grasping, keyboarding for more than 10 to 15 minutes without a five minute break, keyboarding more than two hours total, continuous or repeated overhead work and lifting more than 10 pounds total.  AR 217.  She contends that if the ALJ included all of these limitations, Plaintiff would not have been able to perform the photo finishing clerk and bottle line attendant positions.

In his decision, the ALJ noted all of the above preclusions suggested by Dr. O'Laughlin. AR 21.  He gave great weight to Dr. O'Laughlin's opinions and concluded that Plaintiff was precluded from heavy levels of exertion and from repetitive activities with the upper extremities. AR 25.  However, as Plaintiff notes, the ALJ did not set forth any explanation as to why he rejected the additional limitations.  On remand, if the ALJ decides to reject the additional limitations, he must set forth specific and legitimate reasons for doing so.

      2.    *Dr. Montalvo*

Next, Plaintiff argues that the ALJ improperly rejected Dr. Montalvo's numerous notations between March 28, 2000 and March 2, 2001, that Plaintiff was to remain off work indefinitely.

As noted above, the ALJ rejected Dr. Montalvo's assessment because he did not indicate what criteria he used to support his opinion.  AR 21.  The ALJ explained that Dr. Montalvo's clinic notes only offer Plaintiff's subjective complaints and the recommended treatment, which "does not present a persuasive argument."  AR 21-22.

Plaintiff contends that a diagnosis of psychological abnormalities "naturally" includes a patient's description of her psychological symptoms.  While this may be true, it does not alter the insufficiency of a report based *solely* on subjective complaints.  A majority of Dr. Montalvo's treatment records are set forth on progress report forms completed specifically for Plaintiff's workers' compensation case.  AR 849-886.  The reports have a section for describing both subjective complaints and objective findings.  Under "subjective complaints," Dr. Montalvo described Plaintiff's complaints.  However, under "objective findings," Dr. Montalvo either noted additional subjective complaints or listed Plaintiff's medications.  AR 849-867.  A lack of supporting clinical findings is also a valid reason for rejecting a treating physician's opinion. *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

   3.   *Dr. Chow*

Plaintiff next contends that the ALJ improperly discredited the limitations imposed by consultive examiner Dr. Chow.

After his March 23, 2000 examination of Plaintiff, Dr. Chow opined that she could carry less than 10 pounds occasionally during a third of an eight hour workday, could stand, walk and sit without limitation, but would be limited in bilateral reaching, feeling, fingering and fine manipulation.  AR 183.  The ALJ rejected these limitations as too restrictive and not supported by the documented evidence as a whole.  AR 21.  He explained that Plaintiff was not in any acute distress during the examination, there was no evidence of joint pain, swelling, tenderness or inflammation, and her grip strength was good bilaterally.  AR 21.

Plaintiff points to Dr. Chow's opinion that her limited range of motion and weakness in her bilateral upper extremities was due to myofascial pain, as supportive of his limitations.  AR

183.  Plaintiff also points to Dr. O'Laughlin's February 10, 2000, recommendation that Plaintiff avoid lifting ten pounds.  AR 217.  Although there may be conflicting evidence, the courts do not have the responsibility for weighing the evidence and resolving conflicts therein.  That responsibility belongs to the Commissioner alone.  *Richardson v.  Perales*, 402 U.S. 389, 399 (1971).  Even where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld.  *Holohan v. Massanari*, 246 F.3d 1196, 1201 (9th Cir. 2001).

   4. *Dr. Kucera*

   Finally, Plaintiff argues that the ALJ ignored the limitations imposed by Agreed Medical Examiner Dr. Kucera.

   After examination, Dr. Kucera precluded Plaintiff from very heavy lifting, repetitive twisting of the head and neck, repetitive use of the arms above shoulder level, and forceful activities bilaterally.  AR 321.  The ALJ notes these findings, and states that they were based on Dr. Kucera's clinical findings, which were slight to moderate in restriction.  AR 21.  In formulating Plaintiff's RFC, the ALJ gave great weight to Dr. Kucera's opinion and found that Plaintiff was precluded her from heavy levels of exertion and repetitive activities with the upper extremities.  AR 25.

   Plaintiff contends that the ALJ should have included Dr. Kucera's limitation in repetitive twisting of the head and neck and should have accounted for her 15-20% loss in grip strength.  Plaintiff is correct that the ALJ did not set forth any explanation as to why he rejected these additional limitations.  On remand, if the ALJ decides to reject the additional limitations, he must set forth specific and legitimate reasons for doing so.

E. <u>Lay Witness Testimony</u>

   Plaintiff argues that the ALJ fails to expressly disregard the testimony of Plaintiff's sister, Deborah Hanson, and fails to discuss the testimony provided by other family members in their Third Party Daily Activities Questionnaire.

Lay witness testimony as to a claimant's symptoms is competent evidence which the Commissioner must take into account. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). If the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness. *Id.*

Here, the ALJ reviewed Ms. Hanson's testimony but did not expressly reject it. Respondent contends that this error is harmless. However, this error may not be harmless given the ALJ's improper credibility analysis. Ms. Hanson's testimony may lend support to Plaintiff's testimony. Upon remand, the ALJ must consider Ms. Hanson's testimony in conjunction with Plaintiff's credibility analysis and, if he chooses to reject it, must set forth specific reasons for doing so.

As to the Third Party Daily Activities Questionnaires, without determining that the ALJ needs to expressly reject the statements in his decision, the ALJ should consider them in conjunction with Plaintiff's credibility analysis.

F.   Vocational Expert Testimony

Finally, Plaintiff argues that the ALJ erred by concluding that a significant number of jobs existed in the national economy which she could perform. Plaintiff also contends that the ALJ failed to elicit testimony from the VE regarding erosion of the occupational base.

1.   *Significant Number of Jobs*

Here, the VE testified that there were 500 jobs locally and 5,500 jobs nationally for the surveillance systems monitor position, 1,400 jobs locally and 12,400 jobs nationally for the photo finishing clerk position, and 800 jobs locally and 6,700 jobs nationally for the bottling line attendant position. AR 1021-1022. Plaintiff contends that, contrary to the ALJ's finding, there are not a significant number of jobs for the surveillance systems monitor or photo finishing clerk position.

Plaintiff's argument misunderstands how the number of jobs is calculated. First, however, the Ninth Circuit has never found a minimum number of jobs necessary to constitute a

25

significant number within the meaning of the Act. *Barker v. Secretary of Health & Human Servs.*, 882 F.2d 1474, 1478 (9th Cir. 1989) (finding that 1266 jobs in the Los Angeles/Orange County are were considered significant); *see also Moncada v. Chater,* 60 F.3d 521, 524 (9th Cir. 1995); *Martinez v. Heckler,* 807 F.2d 771, 775 (9th Cir. 1986).   In any event, the relevant number is the *total* number of positions available.  In other words, here the total number of local jobs available, considering the surveillance system position, the photo finishing clerk position and the bottling line attendant position, is 2,700.  This constitutes a significant number of positions.

2.      *Erosion of the Occupational Base*

Plaintiff argues that the VE failed to testify regarding how many of the surveillance system, photo finishing clerk, and bottling line attendant positions could accommodate the limitations provided by the ALJ.  Plaintiff contends that this was necessary because some of the jobs listed by the VE would likely have some minor differences in vocational requirements.

Plaintiff's exact argument is unclear.  During questioning, the ALJ asked the VE to assume a person with an RFC to lift and carry more than 10 pounds frequently and 20 pounds occasionally, but couldn't perform repetitive use and forceful pushing/pulling activities with the upper extremities (i.e., could do it occasionally and without great force).  AR 1020.  The VE responded that this person could perform the positions of surveillance system position, photo finishing clerk and bottling line attendant.  Although minor differences may exist in the way these jobs are performed, there was no indication in the record that such differences would have made a difference.

G.      Remand

_____This is action is remanded because of numerous deficiencies.  First, the ALJ must undertake a new credibility analysis, as many of the reasons relied upon in his first analysis were improper.  In analyzing Plaintiff's credibility, the ALJ should examine the Third Party Daily Activities Questionnaires submitted by her family members.  Second, the ALJ must reconsider whether to include the limitations imposed by Plaintiff's fibromyalgia in his RFC finding.  This

decision will be impacted by the credibility analysis, as a majority of the symptoms of fibromyalgia are subjective in nature. Third, the ALJ must provide specific and legitimate reasons for rejecting the additional limitations imposed by Drs. O'Laughlin and Chow. Fourth, the ALJ must provide reasons for rejecting the testimony of Plaintiff's sister, Deborah Hanson.

It is evident that the resolution of the above issues may impact the final conclusion of the ALJ. It is also evident that the resolution of these issues may impact other aspects of the decision. On remand, if it becomes necessary to reexamine any issues not discussed in this opinion, the ALJ must do so.

## CONCLUSION

Based on the foregoing, the case is HEREBY REMANDED to the Secretary pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this decision. The Clerk of the Court IS DIRECTED to enter judgment in favor of Plaintiff Cindy Showers-Baker.

IT IS SO ORDERED.

**Dated:    June 16, 2005**                               **/s/ Dennis L. Beck**
3b142a                                              UNITED STATES MAGISTRATE JUDGE